1

2

3

4

5

6

7

8                      UNITED STATES DISTRICT COURT

9                 FOR THE EASTERN DISTRICT OF CALIFORNIA

10

11   JAMES N. OWENS,                          No.  2:12-cv-01482 KJN

12              Plaintiff,

13       v.                                   ORDER

14   RUSSELL NUXOLL, et al.,

15              Defendants.

16

17          Plaintiff James N. Owens ("plaintiff") is proceeding without counsel and in forma

18   pauperis.[1]  Plaintiff initiated this action on June 1, 2013.  (ECF No. 1.)

19          On June 17, 2013, defendants Russell Nuxoll ("Nuxoll") and Janet Sylten ("Sylten")

20   (collectively, "defendants"), who are also proceeding without counsel, filed a document styled as

21   a "Motion For Summary Judgment" (ECF No. 35), which the undersigned partially construed as a

22   Motion To Dismiss For Lack Of Subject Matter Jurisdiction pursuant to Federal Rule of Civil

23   Procedure 12(b)(1), and set the matter for hearing on August 8, 2013.[2]  (ECF No. 41.)

24   _____

25   [1]  This case proceeds before the undersigned pursuant to Eastern District of California Local Rule
     302(c)(21) and 28 U.S.C. § 636(b)(1).  The parties voluntarily consented to the jurisdiction of the
26   undersigned for all proceedings in this case, including trial and entry of final judgment, and the
     case was formally referred to the undersigned via an order issued on July 9, 2013.  (ECF Nos. 32,
27   36, 39.)  See 28 U.S.C. § 636(c)(1); Fed. R. Civ. P. 73; E.D. Cal. L.R. 301, 305.

28   [2]  A primary argument made within defendants' pending motion is that this court lacks subject

1    Defendants filed their motion along with their own declarations and supporting exhibits.

2    (ECF No. 35.)  Plaintiff filed a written Opposition to the motion on July 8, 2013, as well as his

3    own declaration and some supporting exhibits.  (Opp'n, ECF No. 40.)  Defendants filed a written

4    Reply brief on July 25, 2013, along with additional declarations and some supporting exhibits.

5    (Reply, ECF No. 43.)

6    　　　　The matter came on for hearing on August 8, 2013.  Plaintiff appeared personally on his

7    own behalf.  Defendants appeared telephonically on their own behalves.  During the hearing,

8    plaintiff and defendants each confirmed on the record that they did not have any objections to the

9    authenticity of any exhibits submitted in connection with the hearing.

10   　　　　The undersigned has fully considered the parties' submissions, oral arguments, and

11   appropriate portions of the record in this case and, for the reasons that follow, orders that

12   defendants' motion to dismiss for lack of subject matter jurisdiction be granted.

13   I.    BACKGROUND

14   　　　　Plaintiff filed his original complaint on June 1, 2012, alleging claims for civil assault and

15   civil battery.  (Compl., ECF No. 1 at 1.)  Plaintiff's original complaint described defendants as

16   California residents, namely, residents of "Nevada City, California," at all times relevant to this

17   action.  (Compl., ECF No. 1 ¶ 1.)  After the undersigned recommended that the case be dismissed

18   for lack of jurisdiction, plaintiff filed objections to the undersigned's Findings and

19   Recommendations.  (ECF No. 4.)  He also filed an amended pleading stating that at all relevant

20   times, defendants were instead "residents of Idaho."  (ECF No. 5 at 1.)

21   　　　　Thereafter, the undersigned issued a subsequent order providing that,

22   　　　　　　plaintiff's allegation that defendants are "residents" of Idaho does
           not establish complete diversity of the parties because diversity is
23        determined by the citizenship of the parties, not merely the
           residency of the parties. Accordingly, plaintiff is granted leave to
24        file a declaration that is signed under penalty of perjury and
           supported by documentary evidence, if possible, demonstrating that
25        each defendant was indeed a citizen of Idaho at the time plaintiff
           filed his original complaint. See Blue Ridge Ins. Co. v. Stanewich,
26        142 F.3d 1145, 1148 (9th Cir. 1998) ("In order to avoid dismissal

27   matter jurisdiction given that defendants claim that they are citizens of California, which
     potentially destroys diversity jurisdiction given plaintiff's California citizenship.  (ECF No. 35 at
28   6-9.)

2

for lack of subject matter jurisdiction, the plaintiff must enlarge the record to show the citizenship of each party as of the date that the complaint was filed. A plaintiff may be required to submit additional affidavits with respect to the citizenship of the parties to the appellate court."). [. . .] For the purpose of preparing his declaration, plaintiff is advised that "[t]o be a citizen of a state, a natural person must first be a citizen of the United States." <u>Kanter v. Warner-Lambert Co.</u>, 265 F.3d 853, 857 (9th Cir. 2001). "The natural person's state citizenship is then determined by her state of domicile, not her state of residence." <u>Id.</u> (stating that "[a] person residing in a given state is not necessarily domiciled there, and thus is not necessarily a citizen of that state"). A natural person's domicile" is his or her permanent home, which means the state in which he or she "resides with the intention to remain or to which [he or] she intends to return." <u>Id.</u>

(ECF No. 6 at 2.)

Following this order, plaintiff filed several declarations supporting his new allegation that defendants were citizens of Idaho when he filed his complaint. (Plaintiff's Declarations ("Pl.'s Decls."), ECF Nos. 7-10.) In his declarations, plaintiff stated, in pertinent part, that:

- defendants "introduced themselves to plaintiff in or about November 2009, as being from Idahoe [sic]. They were driving Subaru licensed plates from Idahoe [sic]. . . My sources state the defendants have been living [in Idaho] and they are there now." (Pl.'s Decl. of July 20, 2012, ECF No. 7 at 2.)

- plaintiff "searched the internet with [G]oogle and [] found out that Janet R. Sylten is a resident of Idaho. [S]he was released on an early discharge from the Pocatello Women's Correctional Center on February 22, 2007. She was continuously denied parole since November 15, 2000." (Pl.'s Decl. of August 20, 2012, ECF No. 8 at 2.)

- plaintiff "searched the internet with Google and [] found out that Russell L. Nuxoll is a resident of Idaho. He has filed a 28:2255 Motion in Idaho District Court, on February 28, 2012." (Pl.'s Decl. of August 22, 2012, ECF No. 9 at 1-2.)

- plaintiff "searched the internet with Google and [] found out that Russell L. Nuxoll and Janet Rose Sylten are residents of Idaho. I have made contact with US Court in Boise and Probation Department [sic]. I have made contact with probation officer for both Nuxoll and Sylten. His name is Tod Jorgensen . . . [defendants] are currently on probation and for three more years [sic]." (Pl.'s Decl. of Sept. 4, 2012, ECF No. 10 at 1-2.)

////

////

3

1    Based upon the above-described declarations, the undersigned preliminarily found that:

2
        > [s]olely for purposes of screening this action pursuant to 28 U.S.C.
3        > § 1915(e)(2) and in light of plaintiff's pro se status, plaintiff's
        > declarations sufficiently support his First Amended Complaint's
4        > allegation that diversity jurisdiction exists on the basis of
        > defendants' citizenship in Idaho.  However, this finding in no way
5        > precludes defendants from moving to dismiss this action for lack of
        > jurisdiction after being served with plaintiff's First Amended
6        > Complaint.

7    (Order, ECF No. 12 at 3-4.)

8        At the Status (Pretrial Scheduling) Conference on April 11, 2013, plaintiff stated on the

9    record that he intended to amend his pleading a third time.  Defendants stipulated to permit

10   plaintiff to amend his pleading, but also represented their intention to seek dismissal of any

11   amended pleading.  (ECF No. 30 at 2.)

12       Plaintiff timely filed his Second Amended Complaint on May 7, 2013.  (Second Am.

13   Compl., ECF No. 33.)  Defendants' pending motion targets the Second Amended Complaint.

14   (ECF No. 35.)

15   II.       LEGAL STANDARD

16       A.   Motions To Dismiss For Lack Of Subject Matter Jurisdiction

17       Federal Rule of Civil Procedure 12(b)(1) provides that parties may file motions to dismiss

18   for lack of jurisdiction, and Rule 12(h)(3) provides, in pertinent part, that "[i]f the court

19   determines at any time that it lacks subject-matter jurisdiction, the court must dismiss the action."

20       A motion to dismiss pursuant to Federal Rules of Civil Procedure 12(b)(1) or 12(h)(3)

21   challenges the court's subject matter jurisdiction.  Federal district courts are courts of limited

22   jurisdiction that "may not grant relief absent a constitutional or valid statutory grant of

23   jurisdiction," and "[a] federal court is presumed to lack jurisdiction in a particular case unless the

24   contrary affirmatively appears."  A-Z Int'l v. Phillips, 323 F.3d 1141, 1145 (9th Cir. 2003)

25   (citations and quotation marks omitted); see also Fed. R. Civ. P. 12(h)(3) ("If the court determines

26   at any time that it lacks subject matter jurisdiction, the court must dismiss the action.").

27       When ruling on a motion to dismiss for lack of subject matter jurisdiction, the court takes

28   the allegations in the complaint as true.  Wolfe v. Strankman, 392 F.3d 358, 362 (9th Cir. 2004).

                                        4

1    However, the court is not restricted to the face of the pleadings and "may review any evidence,

2    such as affidavits and testimony, to resolve factual disputes concerning the existence of

3    jurisdiction." McCarthy v. United States, 850 F.2d 558, 560 (9th Cir. 1988), cert. denied, 489

4    U.S. 1052 (1989); see also Warren v. Fox Family Worldwide, Inc., 328 F.3d 1136, 1139 (9th Cir.

5    2003) ("A jurisdictional challenge under Rule 12(b)(1) may be made either on the face of the

6    pleadings or by presenting extrinsic evidence.").

7            A Rule 12(b)(1) jurisdictional attack may be facial or factual.  Safe Air for Everyone v.

8    Meyer, 373 F.3d 1035, 1039 (9th Cir. 2004) (citing White v. Lee, 227 F.3d 1214, 1242 (9th Cir.

9    2000) (citation omitted)).  In a facial attack, the challenger asserts that the allegations contained in

10   a complaint are insufficient on their face to invoke federal jurisdiction.  Id.  By contrast, in a

11   factual attack, the challenger disputes the truth of the allegations that, by themselves, would

12   otherwise invoke federal jurisdiction.[3]  Id.

13           In resolving a factual attack on jurisdiction, the district court may review evidence beyond

14   the complaint without converting the motion to dismiss into a motion for summary judgment.  Id.

15   (citing Savage v. Glendale Union High Sch., 343 F.3d 1036, 1039 n.2 (9th Cir. 2003)).  The court

16   need not presume the truthfulness of the plaintiff's allegations.  Id.

17       B.  "Domicile" For Purposes Of Diversity Jurisdiction

18           In cases not involving federal claims, federal district courts are vested with original

19   jurisdiction over civil actions where the amount in controversy exceeds $75,000 and the parties

20   are citizens of different states.  28 U.S.C. § 1332(a)(1).

21           A person's state citizenship is determined by their state of domicile, not their state of

22   residence.  A person is domiciled in a location "where he or she has established a fixed habitation

23   or abode in a particular place, and [intends] to remain there permanently or indefinitely."  Lew v.

24   Moss, 797 F.2d 747, 749-50 (9th Cir. 1986) (quoting Owens v. Huntling, 115 F.3d 814, 819 (9th

25   Cir. 1940)) (internal quotation marks omitted).  "Residence is physical, whereas domicile is

26   generally a compound of physical presence plus an intention to make a certain definite place

27

28   _____

[3]  In this case, defendants' attack is factual because they filed extrinsic evidence to prove that
they are California residents.  See id.

1  one's permanent abode, though, to be sure, domicile often hangs on the slender thread of intent

2  alone." Weible v. United States, 244 F.2d 158, 163 (9th Cir. 1957).  Residency alone is not

3  sufficient to show an intent to remain; only domicile is determinative.  Kanter v. Warner-Lambert

4  Co., 265 F.3d 853, 857 (9th Cir. 2001).

5       "The intention to remain may be established by factors such as: current residence; voting

6  registration and practices; location of personal and real property; location of brokerage and bank

7  accounts; location of  spouse and family; membership in unions and other organizations; place of

8  employment or business; driver's license and automobile registration; and payment of taxes."

9  Kyung Park v. Holder, 572 F.3d 619, 625 (2009) (citing Lew, 797 F.2d at 750).  No single factor

10 on this list is determinative.  Lew, 797 F.2d at 750.

11       Courts evaluate domicile in terms of "objective facts," and "statements of intent are

12 entitled to little weight when in conflict with facts."  Lew, 797 F.2d at 750 (quoting Freeman v.

13 Northwest Acceptance Corp., 754 F.2d 553, 556 (5th Cir. 1985) (internal quotation marks

14 omitted).  "[T]he actual fact of residence and a real intention of remaining there, as disclosed by

15 [a party's] entire course of conduct, are the controlling factors in ascertaining his domicile."

16 Freeman, 754 F.2d at 555-56.

17       A person's state of domicile for purposes of diversity is determined as of the time the

18 action is filed.  Subsequent events, such as a party's change of domicile, will ordinarily not affect

19 whether a district court has original jurisdiction.  Hill v. Rolleri, 615 F.2d 886, 889 (9th Cir.

20 1980) (citing cases).

21       "A change in domicile requires the confluence of (a) physical presence at the new location

22 with (b) an intention to remain there indefinitely."  Lew, 797 F.2d at 750.  There is a

23 "presumption in favor of an established domicile as against a newly acquired one."  Id. at 750-51.

24 There is no "minimum period of residency" required for a change in citizenship, and a citizen can

25 "instantly transfer his citizenship from one state to another."  See Hawes v. Club Ecuestre El

26 Comandante, 598 F.2d 698 (1st Cir. 1979) (citing Morris v. Gilmer, 129 U.S. 315, 328 (1889)).

27 In order to affect a change in domicile, a party must have an intention to make the new state home

28 and have no present intention of going elsewhere, even if he does not intend to remain

1    permanently at the new domicile.  Holmes v. Sopuch, 639 F.2d 431 (8th Cir. 1981).

2          Intention to remain "indefinitely" does not require an intent to stay at the new location

3    permanently, but "'a person must intend to make that place his home for the time at least.'"

4    Johnson v. Gibson, No. 3:11–CV–00432–AC, 2011 WL 3359974, at *3 (D.Or. Aug. 3, 2011)

5    (unpublished) (quoting Harrell v. Kepreos, No. Civ. 04–3082–CO, 2005 WL 730639, at *1 (D.Or.

6    March 30, 2005) (unpublished); Hawes, 598 F.2d at 701).

7          C.  Burden Of Proof As To Domicile

8          "Once the moving party has converted [a] motion to dismiss into a factual motion by

9    presenting affidavits or other evidence properly brought before the court, the party opposing the

10   motion must furnish affidavits or other evidence necessary to satisfy its burden of establishing

11   subject matter jurisdiction."  Safe Air, 373 F.3d at 1039 (quotation and citation omitted)

12   (emphasis added).  The party asserting diversity jurisdiction generally bears the burden of proving

13   a party's domicile to establish complete diversity.  Lew, 797 F.2d at 749.

14         "When subject matter jurisdiction is challenged under Federal Rule of Procedure 12(b)(1),

15   the plaintiff has the burden of proving jurisdiction in order to survive the motion."  Tosco Corp.

16   v. Cmtys. for a Better Env't, 236 F.3d 495, 499 (9th Cir. 2001) (per curiam), abrogated on other

17   grounds by Hertz Corp v. Friend, 130 S. Ct. 1181 (2010); see also Colwell v. Dep't of Health &

18   Human Servs., 558 F.3d 1112, 1121 (9th Cir. 2009) ("In support of a motion to dismiss under

19   Rule 12(b)(1), the moving party may submit 'affidavits or any other evidence properly before the

20   court . . . It then becomes necessary for the party opposing the motion to present affidavits or any

21   other evidence necessary to satisfy its burden of establishing that the court, in fact, possesses

22   subject matter jurisdiction.") (citation omitted, modification in original).  In other words, the party

23   invoking diversity jurisdiction bears the burden of demonstrating jurisdiction and must support its

24   claim with "competent proof" by a preponderance of the evidence.  Sanchez v. Monumental Life

25   Ins. Co., 102 F.3d 398, 403-04 (9th Cir. 1996).  A party opposing a motion to dismiss for lack of

26   diversity can "fail[] to satisfy his burden because he did not 'submit any evidence-such as a

27   driver's license, voter registration card, utility bills, or tax returns —to corroborate [his] self-

28   serving declarations.'"  See, e.g., Branon v. Debus, 289 Fed. Appx. 181, 183 (9th Cir. 2008)

7

1    (unpublished).[4]

2        III.    DISCUSSION

3            A.   Allegations In Plaintiff's Second Amended Complaint

4        This case arises from alleged physical altercations between plaintiff and defendants in

5    Nevada City, California.  (Second Am. Compl., ECF No. 33 at 2.)  Plaintiff alleges that on or

6    about April 17, 2011, Sylten first "accused plaintiff of breaking her car."  (Id.)  Plaintiff allegedly

7    denied the accusation and a "heated argument" arose.  (Id.)  Plaintiff alleges that Nuxoll then

8    "rushed plaintiff[,] grabb[ed] him by [the] shirt collar and swung him around[,] ripping [the] shirt

9    collar."  (Id.)  Plaintiff allegedly retreated.  (Id.)

10       Plaintiff also alleges that defendants stole various items of personal property from him on

11   April 20, 2011, including 40 silver dollars, 80 mercury dimes, cash, gold, gold dust, his driver's

12   license, etc.  (Id. at 4.)  Plaintiff alleges that defendants slandered him on May 2, 2011, when they

13   "went to the front counter of the sheriff['s] office" and reported that plaintiff had stolen their

14   property.  (Id. at 3.)

15       About three months later, on or about July 19, 2011, defendants allegedly "came onto

16   plaintiff's mine claim."  (Id. at 3.)  Defendants allegedly "rushed plaintiff[,] grabbing him in a

17   strangle hold and rendering him unconscious."  (Id.)  Defendants allegedly "both beat plaintiff['s]

18   face with their fist[s] and [a] metal bar and bent and broke plaintiff's fingers."  (Id.)  Plaintiff

19   allegedly lost consciousness and when he awoke he was bleeding, with his "left eye swollen

20   close[d]," and had "many [bruises] and broken fingers."  (Id.)  When plaintiff stood up and "tried

21   to escape," Sylten allegedly "pursued plaintiff[,] hitting him with a metal bar."  (Id.)

22       Plaintiff's second amended pleading alleges the same claims for assault and battery that he

23   alleged in his original pleading, as well as new claims for "slander per se" and "conversion" of

24   property.  (Id. at 2-5.)  According to the Second Amended Complaint, defendants "at all times

25   herein mentioned were residents of Idaho."  (Id. at 1.)

26   _____
     [4]  Although Branon is an unpublished decision and thus only of persuasive value, it is cited
27   herein pursuant to Ninth Circuit Rule 36-3, which provides that "[u]npublished dispositions and
     orders of this Court issued on or after January 1, 2007, may be cited to the courts of this circuit in
28   accordance with FRAP 32.1."

1          B.  Arguments Regarding Defendants' Domicile

2          In response to the pending motion, plaintiff argues that defendants are currently and have

3   at all relevant times been domiciliaries of Idaho.  (Opp'n at 2-4.)  Defendants, on the other hand,

4   argue that they became California domiciliaries in 2007, when they first moved to Nevada County

5   to mine for gold.  (Def.'s Mot. at 6.)  Although they were forced to live in Idaho to serve prison

6   time in 2009, defendants argue that they always intended to return to California — and that they

7   did indeed do so upon their release in 2011, until they were forced to return to Idaho to complete

8   their probation period.  (Id.)  Defendants argue that, despite plaintiff's allegation that their

9   domicile was Idaho on June 1, 2012, their "domicile is in California and [they] plan on returning

10  to live [there] when they get off of probation."  (Id.)

11         As the undersigned observed during the hearing, the pro se parties made some efforts to

12  discover and present the facts, evidence, and arguments relevant to the determination of

13  defendants' domicile as of June 1, 2012, the date plaintiff initiated this action.  Admittedly, the

14  question is a somewhat close one.  Nevertheless, it is plaintiff's burden to prove defendants'

15  domicile as of June 1, 2012, and for the reasons set forth below, the court ultimately finds that

16  plaintiff has not met his burden.

17         1.  *Interactions Between The Parties*

18         Based upon the documentary evidence filed before the hearing and upon the testimony

19  given during the hearing, defendants live a rather off-the-grid lifestyle and own no real property.

20  This somewhat complicates the "domicile" analysis and requires the court to examine a broad

21  swath of evidence to ascertain defendants' domicile as of June 1, 2012.[5]

22         The parties met in California in 2009, and began camping next to each other in Nevada

23  County, where they prospected for gold.[6]  (ECF No. 23 at 10.)  Defendants were receiving food

24

25  [5]  The court does not exhaustively set forth all the evidence presented by the parties, but instead
26  addresses the evidence the court finds most persuasive for purposes of its analysis.

27  [6]  "[Defendants] were sort of campin' where I was camping [in Nevada County, California]."
    (ECF No. 23 at 10.)
28

1   stamps and benefits in California at this time.[7]  (Def.'s Mot. at 6.)

2          A few weeks later, however, defendants were extradited to Idaho on federal criminal

3   charges relating to destruction of federal property located in Idaho.  (Def.'s Mot. at 5, Exh. 1 to

4   Def.'s Mot.; Opp'n at 2.)  When defendants were extradited, they left their Subaru, camping and

5   mining equipment, packs and duffel bags of clothing and shoes, tents, sleeping bags, boxes of

6   food, and items of personal property in plaintiff's care in Nevada County.  (Opp'n at 2-3.)  They

7   wrote to plaintiff while imprisoned in Idaho, inquiring about their car, mining equipment, and

8   personal property, all of which plaintiff was holding until their release.  (Id. at 4.)

9          When defendants were released from prison in March of 2011 and placed on probation in

10  Idaho (ECF No. 23 at 14), they promptly traveled back to California, where plaintiff picked them

11  up from a bus station and allowed them to stay in his camper in Nevada City.  (Exh. 1 to Def.'s

12  Mot.)  Defendants explain that they "had no real address in Idaho when released from prison and

13  immediately made arrangements to go back to California where they were [previously] living

14  before being extradited to Idaho in 2009."  (Def.'s Mot. at 7; Exh. 12 to Def.'s Mot.)

15         Defendants' travel permit gave them 30 days to find "residence and employment" in

16  California while on probation.[8]  (Exh. 12 to Def.'s Mot.)  Defendants did not secure residences or

17  jobs in the 30-day period, and they did not do so in the extra few months their probation officer

18  allowed them to remain in California to pursue their small claims case against plaintiff.[9]  (Id.)

19  According to defendants' hearing testimony, their failures to obtain jobs and residences in

20  California during this period was due to the fact that they had little in the way of money or

21

_____

22  [7]  (ECF No. 40 at 15-16 (Letters to Sylten from Nevada County Department of Social Services in
    Nevada City, California, dated 10/14/09 (stating that her food stamps were "stopping" on
23  November 30, 2009, unless she filed a new application) and 11/16/09 (stating defendant's
    application had been approved and stating her eligibility for county benefits starting in November
24  2009 through April 2010).)

25  [8]  (Exh. 12 to Def.'s Mot. (Letter to Court from defendants' Probation Officer, Todd Jorgensen,
    dated June 6, 2013 ("Jorgensen Letter")).)
26

27  [9]  Defendants were permitted to remain in California despite the expiration of their travel permit
    due to their small claims court action against plaintiff.  (Def.'s Mot. at 6-7; see also Jorgensen
28  Letter.)

1    possessions such that they were essentially "living in the woods" and in plaintiff's camper, and

2    also due to various incidents related to the deterioration of their friendship with plaintiff, which

3    hindered their employment prospects and abilities to find housing.  However, defendants were

4    able to arrange to receive public assistance in California during this time.  (Def.'s Mot. at 6-7, 9

5    (indicating defendants obtained benefits through the District Attorney Victim Witness program

6    following the violent altercation with plaintiff in July 2011); ECF No. 44 at 3 (Sylten's letter to

7    plaintiff of April 23, 2011 (explaining that she had applied for food stamps and benefits in

8    Nevada City and that they would be sent to a P.O. Box in Placer County, California).)

9         Shortly after defendants returned to California in 2011, the parties' friendship soured and

10   mutual distrust grew.  Plaintiff believed defendants stole his rare coins and other items of

11   personal property while they were staying in his camper.  (Opp'n at 4-5.)  Defendants believed

12   plaintiff stole their mining equipment, namely, a dredge.  (ECF No. 35 at 134-135.)  Defendants

13   filed an action against plaintiff in small claims court regarding the theft of the dredge, which they

14   ultimately won.  (Id.)

15        The friendship deteriorated further with the parties' disputes escalating to physical

16   violence.  In July of 2011, plaintiff thought defendants had "jumped his claim" and stolen his

17   mine and were not planning to leave it, such that he felt compelled to initiate what became a

18   violent confrontation with them.[10]  Plaintiff was named in criminal charges stemming from the

19   physical altercation, and defendants became Victim Witnesses, listing California addresses as

20   their "home" addresses for purposes of the District Attorney's Victim Witness database.  (See,

21   e.g., ECF No. 35 at 131 (listing "22909 Lowell Hill Road" in Nevada County as Sylten's "home"

22   address); ECF No. 35 at 132 (listing a "Nevada City" address for Nuxoll); see also ECF No. 44 at

23   7 (Nuxoll lists "Nevada City" as his address on a form dated April 25, 2011).)

24

25   [10]  Plaintiff testified during part of the criminal action against him that he initiated the 7/17/11
     "confrontation" at his mine in July of 2011 because he knew that "[t]hey [defendants] were going
26   to be there from now on.  This is what I decided.  They were at my mine where I was mining.  I
     knew that they were not going to leave even if they took the dredge.  They didn't take the
27   dredge."  (ECF No. 23 at 41.)  Plaintiff was sure "[t]hey had jumped my claim."  (ECF No. 23 at
     66.)  Plaintiff says defendants "jumped my claim and moved camping and started mining on or
28   about July 18, [2011]."  (Opp'n, ECF No. 40 at 4.)

On August 31, 2011, the small claims court found in defendants' favor and ordered

plaintiff to compensate defendants for the loss of their dredge.  (ECF No. 35 at 134-35.)   The

small claims court also found that at the time defendants were extradited in 2009, defendants had

planned to return to California to "join forces" with plaintiff in a "prospecting venture."  (Id.)

The court held that, during their 18-month incarceration in Idaho, defendants left their personal

property with plaintiff and intended to return to it.  (Id.)  Following the small claims judgment,

defendants returned to Idaho for the remainder of their probation.  (Def.'s Mot. at 4.)  Defendants

state that they "plan on returning to California as soon as their probation is over."  (Id. at 7.)

   2.  *Analyzing Plaintiff's Evidence*

Plaintiff has offered some evidence indicating that defendants were domiciled in Idaho as

of June 1, 2012.  To his credit, plaintiff appears to have attempted to gather some evidence and

complete some internet searches in efforts to trace defendants' whereabouts over the years.  Yet,

plaintiff provided little *actual evidence* to the court aside from his own sweeping conclusions and

descriptions of his internet search results.

As an initial matter, while defendants resided in Idaho on June 1, 2012, defendants'

physical presence in Idaho on that date does not necessarily make them *domiciliaries* of Idaho.

See Kanter, 265 F.3d at 857 ("Residency alone, however, is not sufficient to show an intent to

remain; only domicile is determinative.")  The terms of defendants' probation *required* them to be

in Idaho at that time, which weighs against defendants' having a true "intent to remain" in Idaho.

See Lew, 797 F.2d at 750 (domicile requires physical presence *and* "an intention to remain there

indefinitely."); Branon, 289 Fed. Appx. at 183 (9th Cir. 2008) ("[I]t was certainly possible for

[the plaintiff] to retain his previous domicile while incarcerated in Arizona, *if he did not intend to

remain in Arizona after his release* from jail.") (citing Lew, 797 F.2d at 750) (emphasis added);

Hardaway v. Nooth, No. 3:10–CV–3107–ST, 2011 WL 7276958, at *4 n.2 (D.Or. Oct. 6, 2011)

(unpublished) ("Federal courts typically presume a prisoner to be a resident of the state he or she

formerly resided in prior to the incarceration.") (citing cases).[11]

---

[11] The Ninth Circuit has not squarely addressed the issue of whether a prisoner is domiciled in his
place of incarceration for purposes of diversity jurisdiction.  See, e.g., U.S. v. Arango, 670 F.3d
988, 997 n.7 (9th Cir. 2012) ("We do not decide whether a prisoner can establish domicile in his

1        In terms of relevant documentary evidence, plaintiff produced a receipt showing that

2    defendants purchased mining equipment in Oregon on July 10, 2009.  Plaintiff argues that this

3    receipt demonstrates that defendants did not intend to stay in California in 2009.[12]  (Exh. 5 to

4    Pl.'s Opp'n.)  Yet defendants' purchase of mining equipment in *Oregon* does not clearly support

5    plaintiff's position that defendants' domicile is *Idaho*.  On the terms of his own pleading and

6    arguments in his Opposition, it is plaintiff's burden to prove that *Idaho* was defendants' domicile

7    on the relevant date (or, at a minimum, somewhere other than California).  Moreover, the receipt

8    indicates that the mining equipment was to be sent to an address just outside Nevada City: 10026

9    Reservoir Street in California.  If anything, then, the receipt does not bolster plaintiff's position

10   that defendants are Idaho domiciliaries, and it actually somewhat bolsters defendants' position

11   that they intended to pursue a mining operation in California in 2009.  (Id.)

12       Plaintiff also proffered evidence indicating that defendants initiated a claim on the "Lucky

13   Raven" mine in Idaho in September 2009.  (Exh. 4 to Opp'n.)  Yet, when the undersigned asked

14   defendants about this mine during the hearing, Nuxoll credibly testified that while he and Sylten

15   registered the mine in 2009 and considered potentially mining it, they ultimately chose to let the

16   claim go and never completed the claims-filing process with the Bureau of Land Management.

17   Accordingly, plaintiff's proffered "Lucky Raven" mine evidence is equivocal at best.

18       Plaintiff also proffered evidence in the form of his own testimony during the hearing.[13]

19   In general, the undersigned finds plaintiff's testimony to have been credible.  Plaintiff testified

20

21

_____

22   place of incarceration for purposes of federal diversity jurisdiction, a question that the Ninth
     Circuit has yet to address.") (citing Stifel v. Hopkins, 477 F.2d 1116, 1124 (6th Cir. 1973)

23   (adopting a rebuttable presumption that a prisoner retains residency in the place where he lived
     prior to incarceration for the purposes of diversity jurisdiction: "the prisoner . . . should not be

24   precluded from showing that he has developed the intention to be domiciled at the place to which
     he has been forced to remove").)

25   [12]  Plaintiff argues that defendants were "continuously travelling between Idaho, Washington,

26   Oregon and California in 2009."  (Opp'n, ECF No. 40 at 3.)

27   [13]  While plaintiff filed other documentary evidence in connection with his motion, none of the
     other documents constitute valid evidence that would materially inform the analysis of

28   defendants' domicile as of June 1, 2012.

1   that defendants currently have a travel trailer in Idaho.[14]  Perhaps most significantly, plaintiff

2   testified that defendants' car, a Subaru, was and is registered in Idaho, and he also testified that he

3   re-registered the car in Idaho at Sylten's request during her incarceration.  The fact that a party's

4   car is registered in a given state bears on the "domicile" analysis, see Kyung Park, 572 F.3d at

5   625, and plaintiff has established that defendants' Subaru was registered in Idaho during the

6   relevant period.  This evidence weighs in favor of plaintiff's argument that defendants were Idaho

7   domiciliaries prior to and on June 1, 2012.

8          Plaintiff also testified that when defendants were "prospecting" for gold with him in

9   California in 2011, he does not recall defendants stating that they intended to stay in California.

10  Yet plaintiff also testified that defendants did not mention returning to Idaho.  Plaintiff also

11  testified that he and defendants planned to travel to Arizona together to "go treasure hunting."

12  Taken together, these statements do not tip the scales one way or the other as to whether

13  defendants had the requisite intent to remain in California.

14         Significantly, plaintiff testified that it seemed like "everything [defendants] owned was in

15  their station wagon" at his campsite in California.  Plaintiff also testified that defendants lived a

16  "transient" lifestyle, and then gave the following testimony regarding their prospecting lifestyle:

17              Court: And so [defendants] did not have a fixed domicile or
                residence in one place, it's wherever they were at the time, with all
18              their stuff, is where they were living?

19              Plaintiff: Yes.

20              Court:  So, did that mean, in terms of their being transient, when in
                fact they were in California, that's where they were living, because
21              that's where all their stuff was?

22              Plaintiff: Yes.

23  This testimony tends to undermine plaintiff's argument that defendants were Idaho domiciliaries

24  in 2009: if defendants' transient, prospecting lifestyle means defendants essentially intend to live

25  wherever their "stuff" is located, and if all of defendants' "stuff" was in Nevada County in 2009,

26

27  _____
    [14]   Plaintiff also testified that he believed that defendants had items of personal property in Idaho
    even when they were staying with him in California in 2011, but he offered no evidence
28  supporting this belief, and he specified only the "travel trailer" when asked about such property.

1    this evidence suggests defendants intended to be domiciled in California when they camped next

2    to plaintiff in at least 2009.  See Lew, 797 F.2d at 750 (domicile requires physical presence and

3    "an intention to remain there indefinitely.")

4            3.  *Analyzing Other Evidence Of Domicile*

5            Again, "[t]he intention to remain may be established by factors such as: current residence;

6    voting registration and practices; location of personal and real property; location of brokerage and

7    bank accounts; location of spouse and family; membership in unions and other organizations;

8    place of employment or business; driver's license and automobile registration; and payment of

9    taxes."  Kyung Park, 572 F.3d at 625 (citing Lew, 797 F.2d at 750).  No single factor on this list

10   is determinative.  Lew, 797 F.2d at 750.  During the hearing, the defendants gave testimony in

11   response to the undersigned's questions on these and other topics.  In general, the undersigned

12   finds defendants' testimony to have been credible.

13           Defendant Sylten testified that she was born in 1959 and raised in California, but moved

14   away at age 14.  She testified that she was incarcerated from 1998 through 2003 in Idaho, and

15   released on parole in Idaho until 2007.  She testified that she had a paid "finishing job" in Idaho

16   during her parole prior to 2007.  If anything, this evidence potentially weighs in favor of Sylten

17   having been domiciled in Idaho prior to 2007.

18           Sylten also testified that near the end of 2007, she moved back to California.  She testified

19   that from 2007 through 2009, she lived in Nevada County, California, prospecting and mining on

20   the South Yuba River and living out of her tent and Subaru, except for a two-week period when

21   she traveled to Idaho with Nuxoll.  Sylten testified that she lived on federal land in California and

22   used a "general delivery" address to get mail.  This evidence generally weighs in favor of

23   defendants having been domiciled in California beginning in 2007.

24           Sylten testified that she owns no real property in Idaho, but that she receives mail there at

25   a friend's post office box, and that the friend forwards important mail to her.  Sylten also testified

26   that, while she and Nuxoll had filed mining claims in Idaho in 2005, they did not renew the

27   claims in 2007, 2008, or 2009, and the claims lapsed.  Sylten testified that she had no land or

28   mining claims that she owned in Idaho after 2007.  This evidence generally weighs in favor of

defendants *not* having been domiciled in Idaho beginning in 2007.

Sylten also testified that she had access to a trailer located in Idaho even though she was living in California in 2007 through 2009, but that it is in someone else's name, that it was located on a friend's property, that there was no truck to pull it, and that it was not registered.[15] Plaintiff would have brought the trailer to California with her in 2007, but she had no truck to pull it. This evidence might otherwise weigh somewhat in favor of defendants' having been domiciled in Idaho, but the fact that the trailer is owned by someone else and is located on someone else's land renders the evidence equivocal on the issue. Moreover, Sylten testified that other than the travel trailer, she had no property in Idaho in 2007.

Sylten also testified that her car, a Subaru, is registered in Idaho even though she lives in California because it was cheaper to re-register the car in Idaho even after she moved to California. She also testified that she currently has an Idaho driver's license. This evidence weighs in favor of defendants having been domiciled in Idaho at the relevant time.

Nuxoll testified that he was born in Oregon, but that prior to 2007 he and Sylten lived together in the "travel trailer" in Idaho, which weighs in favor of defendants having been domiciled in Idaho prior to 2007.

Nuxoll testified that he has not had a bank account since 2005 or 2007. Nuxoll also testified that he has not had a driver's license in any state since 2007, and that his last driver's license was issued in Oregon, in 2005. This evidence does not strongly bear on the issue of whether defendants were domiciled *in Idaho* during the relevant time period.

Nuxoll also testified that he has held a part-time paid "staffing job" since June of 2013, while on probation in Idaho. He also testified that he previously had a paying job in Idaho, but that the job was during the terms of his parole there. This evidence could weigh in favor of Nuxoll being domiciled in Idaho in 2013, however, as discussed elsewhere herein Nuxoll's current presence in Idaho is involuntary and is required by the terms of his probation, undercutting the significance of this evidence.

---

[15] Plaintiff also testified that defendants had a "travel trailer" in Idaho after their release from prison in 2011.

16

1      Nuxoll testified that he and Sylten moved to California together in 2007.  He testified that

2  they originally traveled to California in 2007 to visit a friend with a "prospect" in Nevada County

3  that "had good gold on it" and to try mining there, and that they liked it so much they decided to

4  move there and stay in California.  He testified that they took all of their personal possessions and

5  the "mining stuff they always take."  He testified that they took a "couple trips" from Idaho to

6  California to "check it out" before they decided to stay in California and not return to Idaho.

7  Nuxoll testified that they had been using a "general delivery" address in California, but that they

8  eventually got a post office box so that they could receive food stamps and public assistance

9  regularly, and from then on "we stayed" in California.  This evidence generally weighs in favor of

10  defendants having been domiciled in California beginning in 2007.

11      Nuxoll testified that in 2009, he and Sylten were arrested in California and extradited to

12  Idaho, where they were incarcerated for 18 months.[16]  Nuxoll testified that "as soon as"

13  defendants' probation began, they returned to California "to live," but due to the terms of their

14  probation, they could only return on a 30-day travel permit.  Nuxoll testified that he and Sylten

15  "didn't have nothing" in the way of possessions or money, that plaintiff "wouldn't let [them]

16  have" their belongings, that they were essentially "living in the woods" in Nevada County at that

17  time, and that they kept having "problems" and "big issues" with plaintiff, all of which hindered

18  their ability to secure permanent jobs and residences during their 30-day permit period.  This

19  evidence generally supports defendants' position that they intended to remain in California prior

20  to their extradition as well as after their incarceration — indeed, the fact that they sought and

21  obtained a travel permit to return to California somewhat confirms this assertion.  While their

22  inability to secure jobs and residences during the permit period might be construed as evidence

23  that defendants did not truly intend to remain in California, defendants credibly testified that their

24  socioeconomic status and negative run-ins with plaintiff thwarted their efforts on these fronts.

25  Further, given the "prospecting" lifestyle of *these particular defendants* — which involves a lack

26

27  [16]  Plaintiff argued during the hearing that defendant was charged with assault in Washington
    state in July of 2009, but defendant credibly explained that he had only been in Washington for
28  one week to visit his uncle, and that he did not reside there.

1  of paying work and the practice of living out of tents and cars — defendants' failures to obtain

2  paying work and permanent residences in California signifies relatively little.  Indeed, Nuxoll and

3  Sylten also testified that they have never had paying jobs in California and that they have only

4  mined for gold in this state, but they also testified to having very little in terms of work histories

5  outside the confines of their probation periods.

6        Nuxoll and Sylten also each testified that they have never been registered to vote and have

7  not filed tax returns since 2007.  Sylten testified that she has a Social Security card, but has not

8  had a bank account since 2006.  When Sylten did have a bank account, however, it was a Wells

9  Fargo account located in Idaho.  The fact that Sylten had a bank account in Idaho prior to 2006

10  slightly weighs in favor of her having been domiciled in Idaho at that time, which does not

11  necessarily bear on the issue of defendants' domicile in 2009 and beyond.

12        4.  *Conclusion*

13        Ultimately, plaintiff has offered very little in terms of *actual evidence* supporting his

14  position that defendants were domiciled in Idaho on June 1, 2012.  <u>See</u>, <u>e.g.</u>, <u>Branon</u>, 289 Fed.

15  Appx. at 183 (party opposing a motion to dismiss for lack of diversity can fail to satisfy his

16  burden by failing to "submit any evidence — such as a driver's license, voter registration card,

17  utility bills, or tax returns — to corroborate [his] self-serving declarations.") (internal quotation

18  marks omitted).  In the end, plaintiff has not met his burden.

19        The weight of the evidence supports the finding that California was defendants' domicile

20  beginning in at least 2009 and continuing through at least June 1, 2012.  Given the evidence of

21  defendants' rather unique "prospecting" lifestyle, their entire course of conduct as reflected in the

22  evidence of record, and the fact that their incarceration and probation caused them to be in Idaho

23  involuntarily for incarceration and probation, the balance of evidence tips in favor of the finding

24  that California was defendants' domicile as of June 1, 2012.

25        As noted above and rather tellingly, plaintiff's original pleading described defendants as

26  residents of "Nevada County, California."  (ECF No. 1 at 1.)  Plaintiff failed to give a compelling

27  explanation for why his initial description should now be ignored, testifying that it was "just a

28  mistake."  Plaintiff's own admissions also indicate that defendants were California domiciliaries

1    at least as of 2009, if not before.  During the hearing he indicated that defendants' transient,

2    prospecting lifestyle essentially means defendants intend to live wherever their "stuff" is located,

3    and that most of defendants' "stuff" was at Nevada County at plaintiff's campsite in 2009.  This

4    testimony amounts to evidence indicating that defendants intended to be domiciled in California

5    when they camped next to plaintiff in 2009.  See Lew, 797 F.2d at 750 (domicile requires

6    physical presence and "an intention to remain there indefinitely.").  Further, Sylten testified that

7    she and Nuxoll essentially lived out of their tent and car while prospecting and mining on the

8    South Yuba River in California from 2007 through 2009.  This evidence further supports the

9    findings that, given plaintiff's description of their prospecting lifestyle and as disclosed by their

10   "entire course of conduct," these particular defendants typically reside where they camp to

11   prospect for gold, and that they intend to remain there for the duration of the prospecting venture.

12   See Freeman, 754 F.2d at 555-56 ("[T]he actual fact of residence and a real intention of

13   remaining there, as disclosed by [a party's] entire course of conduct, are the controlling factors in

14   ascertaining his domicile.")

15        Living out of a tent and car might signify impermanence in a case not involving

16   defendants with the sort of unique "prospecting" lifestyle described herein.  However, in this

17   case, the evidence has shown defendants' intention to remain "indefinitely" in California

18   beginning in at least 2009 — and "indefinitely" need not mean "permanently," as long as

19   defendants "'intend[ed] to make that place [their] home for the time at least.'"  See Johnson, 2011

20   WL 3359974, at *3 (quoting Harrell, 2005 WL 730639, at *1; Hawes, 598 F.2d at 701); Weible,

21   244 F.2d at 163 ("Residence is physical, whereas domicile is generally a compound of physical

22   presence plus an intention to make a certain definite place one's permanent abode, though, to be

23   sure, domicile often hangs on the slender thread of intent alone.")

24        Indeed, even construing plaintiff's scant evidence in his favor and assuming that

25   defendants were indeed voluntarily domiciled in Idaho beginning sometime prior to 2007, which

26   triggers a presumption that such domicile did not change, see Lew, 797 F.2d at 750, defendants

27   have produced evidence that their domicile changed to California in or before 2009 when they

28   were both physically present in California and exhibited no present intention to go elsewhere.

19

1   See id.; see, e.g., Holmes, 639 F.2d at 433 & n.2 (8th Cir. 1981) (in order to affect a change in

2   domicile, a party must have an intention to make the new state home and have "no present

3   intention" of going elsewhere, even if he does not intend to remain permanently at the new

4   domicile).

5           Such intent manifested in the form of defendants' living out of Sylten's tent and car while

6   prospecting in California from 2007 to 2009, having most of their worldly possessions with them

7   while prospecting in California, leaving those possessions in plaintiff's care during their

8   incarceration from 2009 to 2011, obtaining permission to travel to California upon their release in

9   2011, promptly returning to California to join forces with plaintiff and continue mining for gold,

10  applying for and receiving public assistance in California, and describing California as their

11  "home" in various documents.  Thus, even assuming *arguendo* that defendants were domiciled in

12  Idaho prior to 2007, defendants have produced evidence to show their domicile changed to

13  California in at least 2009, and plaintiff has not produced evidence compellingly showing

14  otherwise.

15          Evidence of defendants' conduct upon release from prison also confirms that their status

16  as California domiciliaries continued following their 2009 extradition.  A small claims court

17  specifically held that, during their 18-month incarceration in Idaho, defendants *intended to return*

18  *to California* to "'join forces' with [Owens] in the prospecting venture," noting that although they

19  left their personal property with plaintiff during that incarceration, they intended to return to it

20  upon their release.  (ECF No. 35 at 134-135.)  This evidence lends support to the argument that

21  beginning in at least 2009, defendants became California domiciliaries and intended to remain

22  there "indefinitely."  Further, upon their 2011 release defendants promptly restarted their mining

23  operations in California, traveling back to this state and staying with plaintiff.  While the

24  friendship went sour and ended with the physical altercation in July of 2011, that altercation tends

25  to support defendants' argument that their domicile remained California: plaintiff himself thought

26  defendants had *permanently* taken over his mine in July of 2011 and "were not going to leave,"

27  ////

28  ////

1  such that he initiated what became a violent confrontation with them.[17]  In short, if plaintiff

2  himself believed that defendants intended to stay in California indefinitely in 2011, this undercuts

3  his current argument that defendants were actually Idaho domiciliaries at that time.

4        Further, after the physical altercation of July 2011, defendants listed a Nevada City

5  address as their "home" address for District Attorney Victim Witness database purposes, and they

6  also received public assistance in California in 2009 and 2011, all indicating — to at least some

7  degree — defendants' intention to remain in California indefinitely.

8        To be sure, some evidence in the record supports plaintiff's position.  For instance,

9  plaintiff's belief that defendants still have some items of personal property in Idaho (he specified

10  only the travel trailer), that Sylten had a bank account in Idaho prior to 2006, and that Sylten has

11  always had an Idaho driver's license and a Subaru registered in Idaho amounts to evidence

12  weighing in favor of defendants being Idaho domiciliaries.  However, these "single factors" are

13  not necessarily determinative, especially given the other evidence of record described herein.  See

14  Lew, 797 F.2d at 750.  As noted above, it may be that defendants were Idaho domiciliaries at

15  some point prior to 2009, triggering a presumption that such domicile went unchanged, but even

16  if such presumption applied, the weight of the evidence supports the finding that at least as of

17  2009, defendants' domicile had changed to California.  See id.  Ultimately, the fact that

18  defendants used to live in (and currently have access to) a travel trailer on someone else's

19  property in Idaho and in someone else's name does not strongly indicate that Idaho remained

20  defendants' domicile in 2009 or thereafter.  Similarly, the fact that Sylten used to have a bank

21  account in Idaho is not particularly significant given that since 2006, she no longer has any bank

22  accounts in Idaho — or in any other state.

23  ////

24  _____

25  [17]  Plaintiff testified during part of the criminal action against him that he initiated the July 2001 "confrontation" at his mine because he knew that "[t]hey [defendants] were going to be there

26  from now on.  This is what I decided.  They were at my mine where I was mining.  I knew that they were not going to leave even if they took the dredge.  They didn't take the dredge."  (ECF

27  No. 23 at 41.)  Plaintiff was sure "[t]hey had jumped my claim."  (ECF No. 23 at 66.)  Plaintiff says defendants "jumped my claim and moved camping and started mining on or about July 18"

28  [2011].  (Opp'n, ECF No. 40 at 4.)

1       As discussed during the hearing, the fact that defendants are currently residing in Idaho

2  cannot truly be considered evidence of defendants' intent to remain in Idaho.  Defendants'

3  presence in the state is not truly voluntary; it is a part of the terms of defendants' probation.  The

4  same is true for defendants' 18-month incarceration in Idaho in 2009 through March 2011.

5  Physical location alone does not establish domicile.  See Kanter, 265 F.3d at 857 ("Residency

6  alone, however, is not sufficient to show an intent to remain; only domicile is determinative.").

7  Moreover, where one's physical location is not voluntary, it does not necessarily reflect his or her

8  "intent to remain" in that location.  See Branon, 289 Fed. Appx. at 183 (9th Cir. 2008)

9  (unpublished) ("[I]t was certainly possible for [the plaintiff] to retain his previous domicile while

10  incarcerated in Arizona, if he did not intend to remain in Arizona after his release from jail.")

11  (citing Lew, 797 F.2d at 750);  Hardaway, 2011 WL 7276958, at *4 n.2 ("Federal courts typically

12  presume a prisoner to be a resident of the state he or she formerly resided in prior to the

13  incarceration.") (citing cases).

14       Here, on the facts of this particular case, defendants have credibly testified that their

15  intermittent presence in Idaho from 2009 to present has not been voluntary, and that they have

16  remained in that state solely due to their incarceration and the terms of their probation.  The

17  weight of the evidence supports the finding that as of at least 2009, defendants had a physical

18  presence in California and the intent to remain there indefinitely to prospect, with most of their

19  worldly possessions in tow.  The coexistence of defendants' physical presence and intent to

20  remain in California supports the conclusion that California became defendants' domicile in at

21  least 2009 and continued to be their domicile through defendants' imprisonment, release, and

22  ongoing probation in Idaho, and ultimately through June 1, 2012.  Ultimately, plaintiff has not

23  met his burden of producing evidence sufficient to show that defendants were domiciled in Idaho

24  as of the date he filed his pleading.  See Lew, 797 F.2d at 749-51 (explaining that the party

25  asserting jurisdiction generally maintains the burden of proving domicile to establish complete

26  diversity); Sanchez, 102 F.3d at 403-04 (the party invoking diversity jurisdiction bears the burden

27  of demonstrating jurisdiction and must support its claim with "competent proof" by a

28  preponderance of the evidence).

1    Accordingly, for all the foregoing reasons, IT IS HEREBY ORDERED THAT:

2    1.  Defendants' pending "Motion For Summary Judgment," which the undersigned

3        construes as a Motion To Dismiss For Lack Of Subject Matter Jurisdiction (ECF No.

4        35), is hereby GRANTED.  Plaintiff has not met his burden of proving the existence of

5        diversity jurisdiction.

6    2.  Because plaintiff's claims are all based in state common law and there are no federal

7        claims alleged, the case is hereby DISMISSED.  Fed. R. Civ. P. 12(h)(3) ("If the court

8        determines at any time that it lacks subject matter jurisdiction, the court must dismiss

9        the action.").  Because plaintiff's claims are all based in state common law, such

10       dismissal is without prejudice, as plaintiff may choose to file his case in state court.

11   3.  The Clerk of Court is hereby directed to close this case and vacate all future dates.

12   IT IS SO ORDERED.

13   Dated:  October 8, 2013

14

15   KENDALL J. NEWMAN
     UNITED STATES MAGISTRATE JUDGE

16

17

18

19

20

21

22

23

24

25

26

27

28